BURKHALTER KESSLER GOODMAN & GEORGE LLP
Daniel J. Kessler, Esq., SBN 173710
E-Mail: dkessler@bkgglaw.com
Joshua A. Waldman, Esq., SBN 222859
E-Mail: jwaldman@bkgglaw.com
2020 Maine Street, Suite 600
Irvine, California 92614
Telephone: (949) 975-7500; Facsimile: (949) 975-7501

Attorneys for Plaintiffs,
Alex Dastmalchi, Christopher Hoskins,
and Robert Stark

**FILED**

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

2009 DEC -2  PM 2: 13

BY:

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ALEX DASTMALCHI, an individual; CHRISTOPHER HOSKINS, an individual; and ROBERT STARK, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> DISH NETWORK, L.L.C., a Colorado limited liability company, <br><br> Defendant. | CASE NO.: **SACV09-1404 CJC(RNBX)** <br><br> **PLAINTIFFS' ALEX DASTMALCHI, CHRISTOPHER HOSKINS, AND ROBERT STARK'S COMPLAINT FOR DECLARATORY RELIEF** |



COMPLAINT FOR DECLARATORY RELIEF

# COMPLAINT

Plaintiffs Alex Dastlamalchi, Christopher Hoskins, and Robert Stark for their Complaint allege as follows:

## SUBJECT MATTER JURISDICTION

1.    As alleged in greater detail below, Plaintiffs are individual citizens of the State of California.  On information and belief, Defendant Dish Network L.L.C. is a limited liability company under the laws of the State of Colorado, having its principal place of business in the State of Colorado, but qualified to do business in the State of California.  As alleged in greater detail below, the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

## NATURE OF ACTION

2.    This is a declaratory relief action whereby the Plaintiffs seek a judicial determination that: (1) the panel of arbitrators from the American Arbitration Association have no authority to compel the nonsignatories Dastmalchi, Hoskins, and Stark to arbitration in Colorado before a three arbitrator panel against their will; (2) that Newport Satellite Group, Inc. ("NSG") is not the alter ego of any of the Plaintiffs; (3) that the Plaintiffs are not personally liable for any of Dish's purported damages allegedly caused by NSG's unlawful acts; (4) that the Plaintiffs are not third party beneficiaries of the Retailer Agreement between NSG and Dish; (5) and that the Plaintiffs are not NSG's "Affiliates" or "agents."

1

2                                **THE PARTIES**

3

4          3.      Plaintiff Alex Dastmalchi ("Dastmalchi") is an individual who

5   resides in Laguna Beach, California, and who is a citizen of the State of California.

6   Dastmalchi is a shareholder and officer of Newport Satellite Group, Inc.

7

8          4.      Plaintiff Christopher Hoskins ("Hoskins") is an individual who

9   resides in Newport Beach, California, and who is a citizen of the State of California.

10  Hoskins is a shareholder and former officer of Newport Satellite Group, Inc.

11

12         5.      Plaintiff Robert Stark ("Stark") is an individual who resides in

13  Huntington Beach, California, and who is a citizen of the State of California.  Stark is a

14  shareholder and officer of Newport Satellite Group, Inc.

15

16         6.      Plaintiffs Dastmalchi, Hoskins, and Stark are collectively referred to

17  herein as "Plaintiffs".

18

19         7.      On information and belief, Defendant Dish Network, LLC ("Dish")

20  is a Colorado limited liability company under the laws of the State of Colorado with its

21  principal office located in the State of Colorado, and qualified to do business in the

22  State of California.

23

24                     **PERSONAL JURISDICTION AND VENUE**

25

26         8.      As stated above, the Court has jurisdiction over this action under 28

27  U.S.C. section 1332(a)(1).

28

                                        2

9. The Court also has personal jurisdiction over Dish because Dish is engaged in substantial, continuous and systematic activities within the State of California, in that Dish regularly sells entertainment media and hardware to consumers located in the State of California. Through engaging in substantial sales of media and hardware to California consumers, as well as other actions, Dish purposefully availed itself of the privilege of doing business in this forum and is subject to general personal jurisdiction in this state.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), as Dish's acts complained of herein have been committed within this District and have had or will have had effect in this District. Further, venue is proper within this District because Dish is subject to personal jurisdiction within this District at the time the action is commenced.

## BACKGROUND FACTS

11. Dish operates a direct broadcast satellite system that delivers entertainment media to consumers in California, and throughout the United States. In addition, Dish distributes the satellite equipment necessary for consumers to receive Dish broadcasting. One of the methods by which Dish markets and sells its satellite equipment and media to consumers is through the use of independent retailers.

12. Newport Satellite Group, Inc. is a California corporation formed for the purpose of serving as one of Dish's independent retailers to market Dish's satellite media and equipment. At all times relevant hereto, NSG's principal place of business was Orange County, California. Dastmalchi, Hoskins, and Stark are all shareholders of NSG. Dastmalchi and Stark are currently officers of NSG, and Hoskins formerly served as an NSG officer.

COMPLAINT FOR DECLARATORY RELIEF

13.   Dish alleges that NSG entered into a contract with Dish called a Retailer Agreement (the "Retailer Agreement") to market, promote and solicit orders for Dish network programming and satellite equipment.[1]  <u>Significantly, Dastmalchi, Hoskins and Stark never executed the Retailer Agreement in their individual capacities.</u> Rather, Dish asserts that Dastmalchi executed the Retailer Agreement solely in his capacity as President of NSG.   Hoskins and Stark never executed the Retailer Agreement in any capacity at all.

14.   At the time Dish executed the Retailer Agreement with NSG, Plaintiffs are informed and believe and based thereon allege that Dish was fully aware of the identity of at least one or more of NSG's shareholders and officers, but despite this knowledge Dish elected to contract solely with NSG.

## THE ARBITRATION PROVISION

15.   The Retailer Agreement includes an arbitration provision that provides that disputes between NSG and/or any of its "Affiliates" on the one hand, and Dish and/or any of its "Affiliates," on the other hand, shall be resolved through binding arbitration administered by the American Arbitration Association.

16.   Pursuant to the arbitration provision in the Retailer Agreement, any dispute between NSG and its "Affiliates" on the one hand, and Dish and its "Affiliates" on the other hand, arising out of the Retailer Agreement is subject to binding arbitration with the American Arbitration Association ("AAA") before a 3 arbitrator panel in Denver, Colorado.

---

[1] Although Dish alleges that NSG executed the Retailer Agreement, Plaintiffs do not possess an executed copy of the Retailer Agreement, nor has Dish provided Plaintiff's counsel with a copy of one.

# THE UNDERLYING DISPUTE

17.     According to the Retailer Agreement, Dish was required to pay NSG incentives for soliciting and obtaining a new Dish customer activation (hereafter referred to as "Commissions"), as well as monthly residual payments for each customer activation that NSG obtained while the customer continued to pay his or her monthly service fees (hereafter referred to as "Residuals").

18.     NSG contracted with various third party call centers to directly market Dish's services and equipment (hereafter referred to as "Call Centers"). At all relevant times hereto, Dish was aware of and acquiesced to NSG's use of the Call Centers to market, promote and solicit orders for Dish's services and equipment.

19.     Through 2006 and 2007, NSG began to generate enormous volumes of new customer subscriptions and equipment sales for Dish. In fact, NSG's growth rate in terms of sales grew substantially each month until NSG became one of, if not *the*, highest volume retailer for Dish. As a result, NSG was generating more and more Commissions and Residuals due and owing from Dish under the Retailer Agreement.

20.     In order for the Call Centers to obtain new customer accounts for Dish, the Call Centers were required to use Dish's Order Entry Software (hereafter referred to as "OE Software") to ascertain whether the potential customer met Dish's qualification criteria, and to input the new customer's information for billing and servicing. Only Dish could access and retrieve the information that the Call Centers inputted into its OE Software, and only Dish could detect whether information was inputted into the OE Software improperly. NSG never had the ability to monitor or correct the information the Call Centers inputted into the OE Software. Rather, NSG was required to rely upon Dish to notify it if any Call Centers improperly inputted

1   information or attempted to manipulate the sales process in any way.  Stated simply,
2   NSG had no control over Dish's OE Software whatsoever.

4          21.    At all relevant times hereto, Dish's OE Software included large,
5   well known flaws that allowed persons inputting data to circumvent Dish's supposed
6   customer qualification requirements (hereafter the "OE Software Flaws").  NSG could
7   do nothing about Dish's OE Software Flaws.  As discussed above, Dish and the OE
8   Software barred NSG from monitoring or effectively preventing the Call Centers from
9   exploiting the OE Software Flaws to generate sales.  On the other hand, Dish could
10  have easily fixed the OE Software Flaws with very little effort or time, as other satellite
11  providers quickly and easily fixed the same OE Software Flaws after being notified
12  about them.

14          22.    At all relevant times, Dish was fully aware of the existence of the
15  OE Software Flaws and allowed them to remain in existence to allow for additional
16  sales.  Stated simply, the OE Software Flaws allowed Dish to obtain new revenues
17  from new customers who may have not satisfied Dish's *claimed* creditworthiness
18  requirements, all the while maintaining the appearance to Dish's investors and "Wall
19  Street" that Dish only desired and obtained creditworthy customers.

21          23.    NSG is informed and believes, and based thereon alleges, that Dish
22  intentionally failed and refused to fix the OE Software Flaws because Dish was
23  acquiring large volumes of customer subscriptions and sales by virtue of the OE
24  Software Flaws, and reaping large profits as a result.

26          24.    Beginning in early 2007, Dish notified NSG that some of NSG's
27  Call Centers were exploiting the OE Software Flaws to generate sales.

28

COMPLAINT FOR DECLARATORY RELIEF

25.     In response, and due to Dish's failure and refusal to fix its own OE Software Flaws, NSG developed aggressive policies to deter and punish Call Centers that exploited the OE Software Flaws to obtain sales. Specifically, NSG implemented a quality control system whereby any independent sales representative responsible for exploiting the OE Software Flaws was immediately terminated; any manager who oversaw two sales representatives terminated for these activities was also terminated; and if three problematic sales took place from the same call center, NSG immediately terminated the call center.

26.     Pursuant to the foregoing policy, NSG terminated its business relationship with a Call Center called SMART in May of 2007 because NSG was informed the Call Center had exploited the OE Software Flaws despite NSG's extensive efforts to prevent such sales tactics. The SMART Call Center had been one NSG's best performing and most profitable Call Centers at the time NSG terminated their relationship.

27.     Immediately after NSG voluntarily closed the SMART call center, Stark, who was NSG's President at the time, sent all of NSG's other call centers an e-mail that reiterated NSG's demand that the call centers never exploit Dish's OE Software Flaws and threatened to close any other call center that did so.

28.     In addition to NSG instituting policies to deter the exploitation of Dish's OE Software Flaws, NSG also opened a business center in Costa Rica devoted primarily to quality control. At no time were any of the Plaintiffs personally involved in any of the exploitation of Dish's OE Software Flaws.

29.     Further, NSG even notified the police about one call center representative who exploited the OE System Flaws in an unlawful manner.

30.     In October of 2007, Dish summoned NSG's shareholders consisting of Dastmalchi, Hoskins, and Stark to meet regarding alleged problematic sales resulting from Dish's OE Software Flaws.  At this meeting, Dish acknowledged NSG's transparency, cooperation, and willingness to solve the issue of problematic sales caused by Dish's OE Software Flaws.

31.     On October 4, 2007 (and despite NSG's transparency, cooperation, and willingness to cooperate with Dish to address sales related to Dish's OE Software Flaws), Dish unilaterally terminated the Retailer Agreement under the false guise that NSG wrongfully and intentionally exploited Dish's OE Software Flaws.

32.     The true reason Dish terminated the Retailer Agreement was because Dish owed NSG approximately $350,000 in unpaid commissions and would have been required to pay NSG approximately $2.4 million in residuals over the next few years from the sales NSG had generated.  To Dish, it was a far better option to simply terminate the Retailer Agreement under the false guise that NSG breached the Retailer Agreement, and then refuse to pay NSG the substantial outstanding Commissions and Residuals.

33.     After Dish unilaterally terminated the Retailer Agreement, Dish never paid NSG any additional Commissions or Residuals, despite owing substantial Commissions and Residuals.  Further, Dish failed to provide NSG an accurate or complete accounting of Dish's sales and subscriptions acquired through NSG.

## THE ARBITRATION PROCEEDINGS

34.     Thereafter, on April 10, 2009, Dish initiated an arbitration

8

1  proceeding against NSG through AAA.  Dish's demand for arbitration alleged that

2  NSG engaged in numerous violations of the Retailer Agreement.  As a result of NSG's

3  alleged violations of the Retailer Agreement, Dish contends it suffered at least

4  $1,500,000 in damages.  A copy of Dish's demand for arbitration (without exhibits) is

5  attached hereto as Exhibit "A".

6

7       35.    On June 4, 2009, NSG filed a counter claim in arbitration alleging

8  fraud, breach of contract, and other claims against Dish.  A copy of NSG's counter

9  claim is attached hereto as Exhibit "B".

10

11      36.    As of October 8, 2009, NSG and Dish, together with AAA, selected

12  a panel of three arbitrators who were to preside over the *Dish v. NSG* arbitration in

13  Denver, Colorado.

14

15             **DISH'S ATTEMPT TO COMPEL THE PLAINTIFFS**

16             **INTO ARBITRATION AGAINST THEIR WILL**

17

18      37.    On or about November 13, 2009, Dish filed a motion for leave to

19  file an amended demand for arbitration with AAA.  Dish's motion requested leave from

20  the panel of arbitrators to add Dastmalchi, Hoskins, and Stark as individual

21  respondents on the purported grounds that "upon information and belief, discovery will

22  show that [Dastmalchi, Hoskins, and Stark] created and operated [NSG] as a corporate

23  fiction to perpetrate a fraudulent scheme against [Dish]," and thus Dish contended that

24  Plaintiffs should be personally liable for the damages Dish alleges it sustained as a

25  result of NSG's allegedly unlawful acts.

26

27      38.    In addition, Dish argued that Dastmalchi, Hoskins, and Stark were

28  NSG's "Affiliates," and thus bound by the Retailer Agreement executed only by NSG.

1  Further, Dish argued, with no legal or factual support whatsoever, that the Plaintiffs
2  could be compelled to arbitrate against their will because they were allegedly NSG's
3  "agents" or "partners".

4

5         39.   Dish's motion before the AAA also sought to increase the damages
6  Dish purports to have suffered as a result of NSG's alleged wrongful acts to
7  $12,854,640.  A copy of Dish's motion for leave to file an amended demand for
8  arbitration is attached hereto as Exhibit "C".

9

10         40.   In response to Dish's attempt to invite the panel of arbitrators
11  determine whether Dastmalchi, Hoskins, and Stark could be compelled to arbitrate
12  against their will despite the fact that they never executed the Retailer Agreement,
13  Plaintiffs specially appeared and filed an objection to Dish's motion on November 30,
14  2009 (the "Objection").  Plaintiffs' Objection asserts that only a court of law has the
15  authority to determine whether NSG is the alter ego of Dastmalchi, Hoskins, and Stark
16  such that they may be compelled into arbitration against their will as non signatories to
17  the Retailer Agreement.  Plaintiffs' Objection further argued that the panel of
18  arbitrators is unauthorized to determine this question of arbitrability.  A copy of
19  Plaintiffs' Objection is attached hereto as Exhibit "D".

20

21

22

23            **CAUSE OF ACTION FOR DECLARATORY RELIEF**

24

25         41.   An actual controversy has arisen and now exists between Plaintiffs
26  and Dish concerning their respective rights and duties in that Plaintiffs contend that:
27  (1) the panel of arbitrators from AAA have no authority to compel the nonsignatories
28  Dastmalchi, Hoskins, and Stark to arbitration in Colorado before a three arbitrator

panel against their will; (2) that Plaintiffs are not the alter ego of NSG; (3) that the Plaintiffs are not personally liable for Dish's purported damages allegedly caused by NSG's unlawful acts; (4) that the Plaintiffs are not third party beneficiaries of the Retailer Agreement between NSG and Dish; (5) and that the Plaintiffs are not NSG's "Affiliates" or "agents."

42.   Dish disputes these contentions and contends that: (1) the panel of arbitrators from AAA are authorized to determine whether Plaintiffs are bound to arbitration through the Retailer Agreement and may compel Plaintiffs to arbitration; (2) that Plaintiffs are the alter ego of NSG; (3) Plaintiffs are personally liable for Dish's damages caused by NSG's unlawful acts; (4) Plaintiff are third party beneficiaries of the Retailer Agreement between NSG and Dish; and (5) Plaintiffs are NSG's "Affiliates" or "agents".

43.   Plaintiffs desire a judicial determination of their rights and duties, and a declaration as to whether: (1) the panel of arbitrators from AAA are authorized to compel the nonsignatories Dastmalchi, Hoskins, and Stark to arbitration in Colorado before a three arbitrator panel against their will; (2) whether NSG is the alter ego of the Plaintiffs; (3) whether Plaintiffs are personally liable for Dish's purported damages allegedly caused by NSG's unlawful acts; (4) whether Plaintiffs are third party beneficiaries of the Retailer Agreement between NSG and Dish; (5) and whether Plaintiffs are NSG's "Affiliates" or "agents."

44.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and duties because Dish is presently attempting to compel the nonsignatory Plaintiffs to participate in arbitration in Colorado before a three arbitrator panel against their will; Dish is presently attempting to find the Plaintiffs personally liable for Dish's purported

COMPLAINT FOR DECLARATORY RELIEF

damages allegedly caused by NSG's unlawful acts; Dish is presently asserting that NSG is the alter ego of Plaintiffs; Dish is asserting that Plaintiffs are third party beneficiaries of the Retailer Agreement; and that Plaintiffs are NSG's "Affiliates" or agents.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

1.    For a declaration that that: (1) the panel of arbitrators from AAA have no authority to compel the nonsignatories Dastmalchi, Hoskins, and Stark to arbitration in Colorado before a three arbitrator panel against their will; (2) that Plaintiffs are not the alter ego of the NSG; (3) that the Plaintiffs are not personally liable for any of Dish's purported damages allegedly caused by NSG's unlawful acts; (4) that the Plaintiffs are not third party beneficiaries of the Retailer Agreement between NSG and Dish; (5) and that the Plaintiffs are not NSG's "Affiliates" or "agents."

2.    For costs of suit herein incurred; and

3.    For such other and further relief as the Court may deem proper.


Dated: December 2, 2009 BURKHALTER KESSLER GOODMAN & GEORGE LLP


By: _____
    Daniel J. Kessler, Esq.
    Attorneys for Plaintiffs,
    Alex Dastmalchi, Christopher Hoskins, and
    Robert Stark

COMPLAINT FOR DECLARATORY RELIEF

**EXHIBIT "A"**

# T. WADE WELCH & ASSOCIATES

ATTORNEYS AT LAW
SEVENTH FLOOR
2401 FOUNTAINVIEW, SUITE 700
HOUSTON, TEXAS 77057
(713) 952-4334
FAX (713) 952-4994
www.twwlaw.com

BURKHALTER KESSLER GOODMAN &
GEORGE LLP

RICHARD R. OLSEN

APR 13 2009

April 10, 2009

RECEIVED

**VIA CERTIFIED U.S. MAIL**
Newport Satellite Group
8965 Research Drive
Irvine, CA 92618

c/o Daniel J. Kessler, Esq.
Burkhalter Kessler Goodman & George LLP
2020 Main Street, Suite 600
Irvine, CA 92614
dkessler@bkgglaw.com

Re:      **DEMAND FOR ARBITRATION**

Dear Sirs:

This letters serves as formal notice that DISH Network L.L.C., f/k/a EchoStar Satellite L.L.C. ("DISH Network" or "EchoStar") is electing to arbitrate certain disputes (described below) with Newport Satellite Group ("Newport") pursuant to Section 15.3 of the EchoStar Retailer Agreement (the "Retailer Agreement").[1]

The American Arbitration Association ("AAA") will administer the arbitration. In accordance with AAA Rule-4(a)(ii), DISH Network will file two copies of this demand with the AAA, along with two copies of the arbitration provision within the Retailer Agreement.  In accordance with AAA Rule 4(a)(i), EchoStar makes the following statements:

**I.       Parties Involved.**

The parties are DISH Network L.L.C. and Newport Satellite Group.  The address of each party is set forth below.

---

[1]      The parties subsequently entered into the "OE Retailer Amendment to the EchoStar Retailer Agreement" (the "Amendment").  A copy of the Retailer Agreement and Amendment are attached hereto as Exhibit A and B, respectively.



EXHIBIT A PAGE 13

T. WADE WELCH & ASSOCIATES

**A.    Claimant.**

DISH Network L.L.C.
9601 S. Meridian Blvd.
Englewood, CO 80112

**B.    Respondent.**

Newport Satellite Group
8965 Research Drive
Irvine, CA 92618

(Counsel for Newport Satellite Group)
Daniel J. Kessler, Esq.
Burkhalter Kessler Goodman & George LLP
2020 Main Street, Suite 600
Irvine, CA 92614
dkessler@bkgglaw.com

**II.    Nature of the Dispute**

EchoStar operates a Direct Broadcast Satellite ("DBS") system under the trade name "DISH Network." The DBS system uses high-powered satellites to broadcast movies, sports, and general entertainment programming services to consumers who, in turn, pay a subscription fee to EchoStar. To obtain DISH Network programming, subscribers receive a television signal directly from one of EchoStar's satellites by means of a small, satellite dish antenna that is mounted on or near the consumer's residence. The satellite signal is then transmitted from the satellite dish to a satellite receiver/decoder system (also called a "set top box" or "receiver") connected to a television. To date, DISH Network has over thirteen million subscribers.

Consumers can purchase the aforementioned satellite equipment (*e.g.*, receivers, dish antennas, and related equipment) directly from EchoStar, from certain consumer electronic stores (*e.g.*, Radio Shack), or from authorized independent retailers. The relationship between DISH Network and the independent retailers is governed by an applicable Retailer Agreement.

Newport entered into a Retailer Agreement with EchoStar "to become authorized on a non-exclusive basis, to market, promote, and solicit orders" for DISH Network Programming and satellite equipment. (Ex. A, Introduction ¶ B.) As an authorized retailer, Newport agreed "to use its best efforts to continuously and actively advertise, promote, and market [DISH Network] Programming and to solicit orders thereof, subject to and in accordance with all of the terms and conditions of this Agreement." (*Id.* § 2.3.)

2

T. WADE WELCH & ASSOCIATES

Initially, EchoStar discovered and documented numerous violations of the Retailer Agreement by Newport, including without limitation, the submission of: (1) false and misleading information to EchoStar for the purpose of making current or former DISH Network customers appear as if they were "new" customers so that Newport would qualify for certain incentive payments; and (2) fraudulent social security information to EchoStar for the purpose of qualifying potential customers for promotional programs that required a particular credit score, and thus, allow Newport to receive associated incentive payments.

EchoStar conducted a preliminary "sample" audit of the DISH Network accounts reportedly activated by Newport. The audit revealed that a majority of the accounts submitted by Newport for activation and payment contained either fictitious or duplicate customer information–many of which would not have otherwise qualified for a particular promotion. As a result, Newport illegally garnered a substantial amount of incentive payments from EchoStar.

On or about September 20, 2007, representatives from EchoStar contacted Rob Stark, the President of Newport, to discuss the aforementioned violations of the Retailer Agreement. Although Mr. Stark acknowledged that the sample audit revealed "some serious issues with dirty sales from a large number of call centers selling for Newport Satellite Group," he refused to accept responsibility for the misconduct.[2]

In October of 2007, DISH Network conducted an audit of the accounts submitted by Newport for activation and payment within the year. The audit identifies numerous accounts that contain either fictitious or duplicate customer information. To date, Newport owes EchoStar at least $1.5 million for incentives paid on DISH Network false accounts. EchoStar terminated the Retailer Agreement on October 4, 2007 pursuant to Section 10.4.[3]

In this case, the submission of fraudulent and misleading subscriber information to DISH Network by Newport constitutes fraud and patent violations of the Retailer Agreement, including the following provisions:

**Section 9.1 – Compliance with Laws.**
Retailer shall not engage in any activity or business transaction which could be considered unethical, as determined by EchoStar in accordance with prevailing business standards, or damaging to EchoStar's and/or any of its Affiliates' image or goodwill in any way. Retailer shall under no circumstances take any action which could be considered disparaging to EchoStar and/or any of its Affiliates. Retailer shall

---

[2]     A copy of the correspondence from Rob Stark to EchoStar representatives dated November 20, 2007, is attached hereto as Exhibit C.

[3]     A copy of the Notice of Automatic Termination sent to Newport is attached hereto as Exhibit D.



EXHIBIT A PAGE 15

T. WADE WELCH & ASSOCIATES

comply with all applicable governmental statutes, laws, rules, regulations, ordinances, codes, directives, and orders (whether federal, state, municipal, or otherwise) and all amendments thereto, now enacted or hereafter promulgated (hereinafter "Laws"), and Retailer is solely responsible for its compliance with all Laws that apply to its obligations under this Agreement.

**Section 9.5 – Subscriber Information.**
. . . Retailer acknowledges and agrees that the names, addresses and other identifying information of DISH Network Subscribers ("Subscriber Information") are, as between Retailer and EchoStar, with respect to the delivery of Services and the provision of Hardware, proprietary to EchoStar, and shall be treated with the highest degree of confidentiality by Retailer. Retailer shall not directly or indirectly: (a) make use of any list of past or current DISH Network Subscribers (whether developed by Retailer or obtained from EchoStar or another source), (b) use any Subscriber Information for the direct or indirect benefit of any individual or entity other than EchoStar, . . . (d) reveal any Subscriber Information to any third party for any reason without the express prior written consent of EchoStar . . . .

(Ex. A §§ 9.1, 9.5)

In addition, Newport failed to effectuate the intent and reasonable expectations of the parties—to use the "best efforts to continuously and actively advertise, promote, and market [DISH Network] Programming and to solicit orders thereof, subject to and in accordance with all of the terms and conditions" of the Retailer Agreement. (Ex. A § 2.3.) Instead, Newport abandoned the agreed purpose of the Retailer Agreement, and orchestrated a self-serving scheme designed to defraud thousands of dollars from DISH Network.

For these reasons, EchoStar hereby demands arbitration on the following causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraud; and (4) unjust enrichment.

**III.    Relief Requested.**

EchoStar requests the following relief:

A.    **Damages,** for the injuries described herein;

B.    **Damages,** for attorneys' fees, expenses, and costs incurred by EchoStar in this proceeding pursuant to the Retailer Agreement and applicable law;

C.    **Injunction,** preventing Newport from using any confidential and proprietary DISH Network subscriber information, including social security numbers, and the immediate return of such data to EchoStar.

4



EXHIBIT A PAGE 16

T. WADE WELCH & ASSOCIATES

EchoStar reserves the right to request additional relief as it may show itself entitled throughout the arbitration proceeding.

**IV.   Amount of Claim.**

EchoStar seeks damages, attorneys' fees, costs, and expenses as allowed by the Retailer Agreement.  Upon information and belief, EchoStar's damages are at least $1.5 million.

**V.   Hearing Location.**

Pursuant to Section 15.3 of the Retailer Agreement, the arbitration will be held in Denver, Colorado.

If you have any questions regarding this matter, please do not hesitate to contact me.

Sincerely,

Rick Olsen

Enclosures

cc:    American Arbitration Association (*via Federal Express*)
       Ashlee M. Smith, Esq.

5

EXHIBIT A PAGE 17

# EXHIBIT "B"

1    BURKHALTER KESSLER GOODMAN & GEORGE LLP
     Daniel J. Kessler, Esq., Bar No. 173710
2    Joshua A. Waldman, Esq., Bar No. 222859
     2020 Main Street, Suite 600
3    Irvine, California 92614
     Telephone:  (949) 975-7500
4    Facsimile:   (949) 975-7501

5    Attorneys for Respondent and Counter-Claimant,
     Newport Satellite Group, Inc.
6

7                    AMERICAN ARBITRATION ASSOCIATION
8

9                                          AAA Case NO. 77 147 Y 00192 09
10   DISH NETWORK, L.L.C.,

11                   Claimant,              **NEWPORT SATELLITE GROUP'S
                                            COUNTER-CLAIM FOR:**
12
     vs.
13                                          1.  **FRAUD -- PROMISE WITHOUT
                                                INTENT TO PERFORM;**
14   NEWPORT SATELLITE GROUP,               2.  **BREACH OF CONTRACT;**
                                            3.  **BREACH OF THE CONVENANT OF
15                   Respondent.                GOOD FAITH AND FAIR DEALING;**
                                            4.  **UNJUST ENRICHMENT; AND**
16
                                            5.  **ACCOUNTING.**
17

18

19   NEWPORT SATELLITE GROUP, INC.,

20                   Counter-Claimant,

21   vs.

22   DISH NETWORK, L.L.C.,  and DOES 1 through
23   10,

24                   Counter-Respondent.

25

26

27

28
                                         EXHIBIT _B_ PAGE _18_

                      NEWPORT SATELLITE GROUP'S COUNTER-CLAIM

1

## GENERAL ALLEGATIONS

2

3        1.     At all times herein mentioned, Counter-Claimant Newport Satellite Group, Inc.

4 ("NSG" or "Counter-Claimant") was and is a California corporation with its principle place of business

5 in Irvine, California.

6

7        2.     Counter-Respondent Dish Network, L.L.C., ("Counter-Respondent" or "DISH")

8 was at all relevant times and remains a Colorado limited liability company.

9

10        3.     Counter-Claimant also sues Does 1 through 10. Counter-Claimant is unaware

11 of the true names and identities of these Counter-Respondents, and therefore sues them by such

12 fictitious names. Counter-Claimant is informed and believes, and based thereon alleges that each such

13 fictitious Counter-Respondent is in some way responsible for, or participated in, or contributed to, the

14 matters and things of which Counter-Claimant complains herein, and have legal responsibilities

15 therefore. When the exact nature and identity of each such fictitious Counter-Respondent is

16 ascertained by Counter-Claimant, Counter-Claimant will amend this Counter Claim. Any reference

17 herein to "Counter-Respondent" or "Counter-Respondents" includes Does 1 through 10, and each of

18 them.

19

20        4.     Counter-Claimant is informed and believes, and based thereon alleges, that at all

21 times relevant hereto each of the Counter-Respondents acted as the agent or employee of each of the

22 other Counter-Respondents and did all things alleged herein within the scope and course of such

23 agency or employment. Furthermore, Counter-Claimant is informed and believes, and based thereon

24 alleges, that each such non-nominal Counter-Respondent, in acting as described in this Counter Claim,

25 authorized and ratified the actions of each of the other non-nominal Counter-Respondents.

26

27

28

EXHIBIT B PAGE 19

5.      The American Arbitration Association is the appropriate venue for this dispute and maintains rightful jurisdiction over this dispute pursuant to section 15.3 of the DISH Retailer Agreement that is the subject of this action (the "Retailer Agreement").

## STATEMENT OF OPERATIVE FACTS

6.      DISH operates a Direct Broadcast Satellite system that delivers entertainment media to consumers. In addition, DISH distributes the satellite equipment necessary for consumers to receive DISH broadcasting.   One of the methods by which DISH markets and sells its satellite equipment and media to consumers is through the use of independent retailers.

7.      NSG is an entity formed for the purpose of serving as one of DISH's independent retailers to market satellite media and equipment.

8.      NSG entered into the Retailer Agreement with DISH to market, promote and solicit orders for DISH network programming and satellite equipment.   Although NSG originally started with a general market approach, NSG later focused its marketing efforts on low income Latino consumers.

9.      Pursuant to the Retailer Agreement, DISH was required to pay NSG for soliciting and obtaining a new DISH customer activation (hereafter referred to as "Commissions"), as well as monthly residual payments for each customer activation that NSG obtained as the customer continued to remain a DISH customer and pay their monthly service fees (hereafter referred to as "Residuals").

10.      NSG contracted with various third party call centers to directly market DISH's services and equipment to the target Latino consumers (hereafter referred to as "Call Centers").   The Call Centers were located primarily throughout Latin America, including Mexico, Costa Rica, and

EXHIBIT _B_ PAGE _20_

1   El Salvador.  At all relevant times hereto, DISH was aware of and acquiesced to NSG's use of the Call

2   Centers to market, promote and solicit orders for DISH's services and equipment.

3

4        11.     Through 2006 and 2007, NSG began to generate enormous volumes of new

5   customer subscriptions and equipment sales for DISH.  In fact, NSG's growth rate in terms of sales

6   grew substantially each month.  As a result, NSG was generating more and more Commissions and

7   Residuals due and owing under the Retailer Agreement.

8

9        12.     In order for the Call Centers to obtain new customer accounts for DISH, the Call

10  Centers were required to use DISH's Order Entry Software (hereafter referred to as "OE Software") to

11  ascertain whether the potential customer met DISH's qualification criteria, and to input the new

12  customer's information for billing and servicing.  Only DISH could access and retrieve the information

13  that the Call Centers inputted into its OE Software, and only DISH could detect whether information

14  was inputted into the OE Software improperly.  NSG never had the ability to monitor or correct the

15  information the Call Centers inputted into the OE Software.  Rather, NSG was required to rely upon

16  DISH to notify it if any Call Centers improperly inputted information or attempted to manipulate the

17  sales process in any way.  Stated simply, NSG had no control over the OE Software whatsoever.

18

19       13.     At all relevant times hereto, DISH's OE Software included large, well known

20  flaws that allowed persons inputting data to circumvent DISH's supposed customer qualification

21  requirements.  For example, the OE Software permitted sales representatives to enter social security

22  numbers and credit card numbers known to be associated with a creditworthy individual in order to

23  qualify an otherwise unqualified customer.  Then, at a later point in the process, after a customer was

24  qualified by virtue of someone else's credit information, sales representatives could input the

25  customer's correct information to finalize the order.  In essence, DISH's OE Software allowed for

26  sales representatives to enter two different social security numbers and/or credit cards – one to qualify

27  the customer; and a different one to consummate the sale and bill the customer (This OE Software flaw

28  shall be hereinafter referred as the "Loophole.").

EXHIBIT __B__ PAGE _21_

NEWPORT SATELLITE GROUP'S COUNTER-CLAIM

14.    NSG could do nothing about the Loophole. As discussed above, DISH and the OE Software barred NSG from monitoring or effectively preventing the Call Centers from utilizing the Loophole to qualify otherwise unqualified customers. On the other hand, DISH could have easily closed the Loophole with very little effort or time, as other satellite providers quickly and easily closed the same Loophole after being notified about it.

15.    At all relevant times, DISH was fully aware of the existence of the Loophole and allowed the Loophole to remain open for abuse. Moreover, NSG is informed and believes, and based thereon alleges, that DISH failed and refused to close the Loophole because DISH was acquiring large volumes of customer subscriptions and sales by virtue of the Loophole, and reaping large profits as a result.

16.    Beginning in early 2007, DISH notified NSG that some of NSG's Call Centers were utilizing the Loophole to generate sales.

17.    In response, and due to DISH's failure and refusal to close the Loophole, NSG developed aggressive policies to deter and punish Call Centers that used the Loophole to obtain sales. Specifically, NSG implemented a quality control system whereby any independent sales representative responsible for utilizing unauthorized sales tactics was immediately terminated; any manager who oversaw two sales representatives terminated for these activities was also terminated; and if three problematic sales took place from the same call center, NSG immediately terminated the call center.

18.    Pursuant to the foregoing policy, NSG terminated its business relationship with a Call Center called Smart in May of 2007 because NSG was informed and believes the Call Center had utilized the Loophole despite NSG's efforts to prevent such tactics. The Smart Call Center had been one NSG's best performing Call Centers at the time NSG terminated their relationship.

19.     In addition, NSG instituted policies to deter the use of unauthorized sales techniques such as "charging back" Call Centers' commissions for violations, and even "charging back" Centers 200% of its commissions to deter the unauthorized sales techniques.  NSG also opened a business center in Costa Rica devoted to quality control.

20.     In October of 2007, DISH summoned NSG's principals to meet regarding alleged problematic sales resulting from the Loophole.  At this meeting, DISH acknowledged NSG's transparency, cooperation, and willingness to solve the issue of problematic sales caused by the Loophole.

21.     On October 4, 2007 (and despite NSG's transparency, cooperation, and willingness to solve the issue of problematic sales resulting from the Loophole), DISH unilaterally terminated the Retailer Agreement under the false guise that NSG engaged in fraudulent sales practices through exploiting the Loophole.  Significantly, DISH failed to provide NSG with any information regarding what specific alleged "fraudulent" sales practices were used, which Call Centers allegedly used them, and to what extent.  In short, DISH provided NSG with no information, whatsoever.

22.     DISH is a publicly traded company that is incentivized to present the public image that it seeks only customers with a certain creditworthiness to satisfy its stockholders and the investing community.  In reality, DISH secretly sought, and continues to secretly seek, the lower income, less qualified customers to generate as much profits as possible.

23.     At the time DISH terminated the Retailer Agreement, NSG's rate of sales was dramatically increasing on a monthly basis to the point that NSG was at the very peak of its performance under the Retailer Agreement.  In fact, at the time DISH terminated the Retailer Agreement, the Commissions and Residuals due and owing to NGS were dramatically larger than they had ever been during the course of NSG's performance.  At that time, DISH owed NSG hundreds of

EXHIBIT  B  PAGE 23

1  thousands in unpaid Commissions and ever increasing, substantial Residuals, all in an amount to be
2  proven at the hearing on this matter.

3

4       24.    DISH never paid NSG a single dollar in Commissions and Residuals that were
5  due and owing at the time DISH terminated the Retailer Agreement.

6

7       25.    To date, DISH has failed and refused to pay NSG for Commissions and
8  Residuals due and owing under the Retailer Agreement in an amount to be determined at the hearing,
9  but believed to be well in excess of $1 million.

10

11       26.    NSG is informed and believes, and based thereon alleges, that DISH engaged in
12  a course and pattern of conduct designed to defraud NSG so as to maximize profits derived from
13  NSG's efforts and avoid payment of Commissions and Residuals due and owing to NSG for those
14  efforts.  This fraudulent conduct includes, (1) knowingly providing NSG with OE Software that was
15  susceptible to abuse as discussed above; (2) refusing to allow NSG to have any degree of control over
16  the OE Software; (3) allowing the Loophole to remain open for abuse despite having the ability to
17  quickly and easily close it; (4) acquiring and maintaining customers by virtue of the Loophole; (5)
18  disregarding NSG's great efforts in minimizing abuse resulting from the Loophole (despite not having
19  any control over the OE Software whatsoever); (6) unilaterally terminating the Retailer Agreement
20  under the false guise of unauthorized sales practices by virtue of the Loophole at a time when an
21  exorbitant amount of Commissions and Residuals were due and owing to NSG; and (7) contracting
22  with NSG's former Call Centers to serve as DISH's retailers after DISH terminated the Retailer
23  Agreement with the knowledge that these Call Centers engaged in the same conduct DISH supposedly
24  terminated NSG's Retailer Agreement for.

25

26       27.    NSG is further informed and believes, and on that basis alleges, that DISH's
27  conduct against NSG as alleged herein, is an example of a larger pattern of fraudulent conduct by
28  DISH against other DISH retailers whereby DISH terminates retailer agreements at a time when the

7

EXHIBIT B PAGE 24

1   maximum amount of commissions and residuals are due and owing to the retailer under the false guise

2   of unauthorized sales practices (resulting from the OE Software Loophole that DISH allows to remain

3   open) to avoid having to pay the outstanding Commissions and Residuals due to the retailer.

4

5                              **FIRST CAUSE OF ACTION**

6                         (Fraud- Promise Without Intent to Perform)

7

8          28.     Counter-Claimant re-alleges and incorporates herein by reference each and

9   every allegation set forth in Paragraphs 1 through 27, above.

10

11         29.     By virtue of the Retailer Agreement, DISH made promises to NSG to pay NSG

12  Residuals and Commissions for sales of DISH network programming and satellite equipment.

13

14         30.     At the time DISH made the promises to NSG, DISH had no intention of

15  performing them.

16

17         31.     NSG is informed and believes, and based thereon alleges, that DISH made the

18  promises with the intent to induce NSG into entering into the Retailer Agreement, and into marketing,

19  promoting, and soliciting orders for DISH's satellite programming and equipment for DISH's sole

20  benefit, and without compensating NSG for the same.

21

22         32.     NSG, at the time these promises were made, and at the time NSG took the

23  actions herein alleged, was ignorant of DISH's secret intention not to perform under the Retailer

24  Agreement.  In reliance on DISH's promises, NSG entered into the Retailer Agreement and generated

25  large volumes of new customer subscriptions and equipment sales for DISH.

26

27         33.     NSG's reliance on DISH's promises was justified because: (1) DISH deceitfully

28  gained NSG's trust and confidence through a scheme which included false statements, concealment,

EXHIBIT _B_ PAGE _25_

1    and tactics to "lock-in" NSG to the Retailer Agreement; (2) DISH portrayed an image of a reputable

2    large scale global corporate entity; (3) DISH affirmatively lied to NSG; and (4) NSG could not, in the

3    exercise of reasonable diligence under the circumstances, have discovered DISH's secret intention.

5           34.    The promises made by DISH were in fact false. DISH failed to abide by its

6    promises, and never had any intention of performing under the Retailer Agreement in that DISH: (1)

7    unilaterally terminated the Retailer Agreement at the peak of NSG's performance with the largest

8    amount of Commission and Residuals due and owing to NSG, without just cause, and in furtherance of

9    DISH's scheme to defraud NGS and avoid paying NSG Commissions and Residuals due and owing;

10   and (2) failed and refused, and continues to fail and refuse, to pay NSG Commissions and Residuals

11   due and owing under the false guise that NSG engaged in authorized sales tactics by exploiting the OE

12   Software Loophole.

14          35.    If NSG had known of the actual intention of DISH, NSG would not have

15   entered into the Retailer Agreement with DISH.

17          36.    As a proximate result of DISH's fraud and deceit and the facts herein alleged,

18   NSG has suffered, and will continue to suffer, economic losses in an amount according to proof at the

19   time of arbitration.

21          37.    The aforementioned conduct of DISH was an intentional misrepresentation,

22   deceit, or concealment of a material fact known to DISH with the intention on the part of DISH of

23   thereby depriving NSG of property or legal rights or otherwise causing injury, and was despicable

24   conduct that subjected NSG to a cruel and unjust hardship in conscious disregard of NSG's rights, so

25   as to justify an award of exemplary and punitive damages.

EXHIBIT B  PAGE 26

## SECOND CAUSE OF ACTION

(Breach of Contract)

38.     Counter-Claimant re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 27, above.

39.     NSG entered into the Retailer Agreement with DISH to market, promote and solicit orders for DISH network programming and satellite equipment.

40.     Pursuant to the Retailer Agreement, NSG marketed, promoted and solicited orders for DISH network programming and satellite equipment, and generated large volumes of new customer subscriptions and equipment sales for DISH as a result.

41.     On October 4, 2007, DISH unilaterally terminated the Retailer Agreement without just cause and in furtherance of DISH's scheme to defraud NSG and avoid paying NSG Commissions and Residuals due and owing.  At that time, DISH owed NSG substantial unpaid Commissions and Residuals, an amount to be proven at the hearing.

42.     DISH breached the Retailer Agreement by failing and refusing to make payment to NSG in the sum which was then due and owing under the terms of Retailer Agreement at the time DISH unilaterally terminated the same, all in an amount according to proof at the time of the hearing on this matter.

43.     NSG performed all covenants, conditions, and promises required to be performed on its part in accordance with the terms and conditions of the Retailer Agreement, except those which have been waived or otherwise excused by DISH.

EXHIBIT B PAGE 27

1      44.    As a direct and proximate result of DISH's breach of the Retailer Agreement as

2  alleged herein, NSG has suffered, among other things, general damages, plus costs incurred including,

3  without limitation, attorneys' fees, all to NSG's damage according to proof at the hearing on this

4  matter.

5

6                             **THIRD CAUSE OF ACTION**

7                 (Breach of the Covenant of Good Faith and Fair Dealing)

8

9      45.    Counter-Claimant re-alleges and incorporates herein by reference each and every

10  allegation set forth in Paragraphs 1 through 27, above.

11

12      46.    The Retailer Agreement contained an implied covenant of good faith and fair

13  dealing, which obligated DISH to perform the terms and conditions of the Retailer Agreement fairly

14  and in good faith and to refrain from doing any act that would prevent or impede NSG from

15  performing any or all of the conditions of the contract that it agreed to perform, or any act that would

16  deprive NSG of the benefits of the contract.

17

18      47.    As more thoroughly described above, DISH breached the implied covenant of

19  good faith and fair dealing under the Retailer Agreement by engaging in a course and pattern of

20  conduct designed to defraud NSG and avoid paying NSG Commissions and Residuals due and owing

21  under the Retailer Agreement.

22

23      48.    As a proximate result of DISH's breach of the implied covenant of good faith

24  and fair dealing, NSG has suffered, and continues to suffer, losses consisting of earned but unpaid

25  Commissions and Residuals to its damage in the sum to be established at the hearing on this matter.

26  As a further proximate result of DISH's breach of the implied covenant of good faith and fair dealing,

27  NSG has incurred reasonable attorney's fees in attempting to secure the benefits owed it under the

28  Retailer Agreement.

EXHIBIT $\underline{B}$ PAGE $\underline{28}$

49.     The aforementioned conduct of DISH was an intentional misrepresentation, deceit, or concealment of a material fact known to DISH with the intention on the part of DISH of thereby depriving NSG of property or legal rights or otherwise causing injury, and was despicable conduct that subjected NSG to a cruel and unjust hardship in conscious disregard of NSG's rights, so as to justify an award of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

50.     Counter-Claimant re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 27, above.

51.     Within the last two years, NSG bestowed upon DISH the benefit of large profits resulting from customer subscriptions and sales by and through NSG's performance under the Retailer Agreement.  Although demand has been made, DISH refuses to compensate NSG for these benefits, and has, therefore, been unjustly enriched by NSG's performance.

52.     No payment has been made by DISH to NSG for the Commissions and Residuals due and owing, and there is now owing a substantial sum, with interest, according to proof at the time of arbitration.

## FIFTH CAUSE OF ACTION

### (Accounting)

53.     Counter-Claimant re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 52, above.

EXHIBIT  B  PAGE 29

NEWPORT SATELLITE GROUP'S COUNTER-CLAIM

54.     NSG has filed this Counter-Claim against DISH to recover earned and unpaid Commissions and Residuals.

55.     NSG has never received from DISH an accurate or complete accounting of DISH's sales and subscriptions acquired through NSG.  NSG is demanding that DISH provide NSG with a true, accurate and complete accounting of all sales and subscriptions acquired through NSG's performance of the Retailer Agreement, and all Commissions and Residuals resulting from the same. NSG further requests an order and directive to DISH to provide NSG with a true, accurate and complete accounting as set forth herein.

<b><u>PRAYER</u></b>

**WHEREFORE**, NSG prays for an award against DISH as follows:

<u>On The First Cause of Action:</u>

1.     For an award of consequential damages according to proof at the time of trial;

2.     For an award of general damages according to proof at the time of trial;

3.     For an award of punitive damages according to proof;

4.     For reasonable attorney's fees and costs in an amount to be proven pursuant to the Retailer Agreement; and

<u>On The Second Cause of Action:</u>

1.     For an award of consequential damages according to proof at the time of trial;

2.     For an award of general damages according to proof at the time of trial;

3.     For reasonable attorney's fees and costs in an amount to be proven pursuant to the Retailer Agreement; and

EXHIBIT  B  PAGE  30

13

On the Third Cause of Action:

1.   For an award of consequential damages according to proof at the time of trial;

2.   For an award of general damages according to proof at the time of trial;

3.   For an award of punitive damages according to proof; and

4.   For reasonable attorney's fees and costs in an amount to be proven pursuant to the Retailer Agreement.

On The Fourth Cause of Action:

1.   That DISH be ordered to pay NSG the outstanding consideration due and owing to NSG under the Retailer Agreement, with interest thereon from the date of termination;

2.   For an award of consequential damages according to proof at the time of arbitration;

3.   For reasonable attorney's fees and costs in an amount to be proven pursuant to the Retailer Agreement, and

4.   For an award of exemplary and/or punitive damages.

On The Fifth Cause of Action:

1.   For an order directing DISH to provide NSG with a true, accurate, and complete accounting of all sales and subscriptions acquired through NSG through NSG's performance of the Retailer Agreement, and all commissions and residuals resulting from the same.

EXHIBIT  B   PAGE  31

<u>On All Causes Of Action:</u>

1.     For interest at the legal rate;

2.     For reasonable attorney's fees and costs in an amount to be proven;

3.     For costs of suit; and

4.     For such other and further relief as the Panel may deem just and proper.

DATED: June 4, 2009             BURKHALTER KESSLER GOODMAN & GEORGE LLP

By: _____

Joshua A. Waldman, Esq.
Attorneys for Respondent/Counter-Claimant,
National Satellite Group, Inc.

EXHIBIT B PAGE 32

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California.  I am over the age of 18 years and not a party to the within action; my business address is 2020 Main Street, Suite 600, Irvine, California 92614.

On **June 4, 2009,** I caused the foregoing document described as **NEWPORT SATELLITE GROUP'S COUNTER-CLAIM FOR: 1. FRAUD – PROMISE WITHOUT INTENT TO PERFORM; 2.  BREACH OF CONTRACT; 3. BREACH OF THE CONVENANT OF GOOD FAITH AND FAIR DEALING; 4. UNJUST ENRICHMENT; AND 5. ACCOUNTING** to be served on the interested parties in this action [X] by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as stated on the attached Service List:

[X]   **BY MAIL**

[ ]   I deposited such envelope in the mail at **Irvine, California.**  The envelope was mailed with postage thereon fully prepaid.

[X]   I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with U.S. postal service on that same day in the ordinary course of business.  I am aware that, on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]   **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **June 4, 2009,** at **Irvine, California.**


MARY A. CRONIN

1

**SERVICE LIST**

2

3

4  Rick Olsen, Esq.
   T. Wade Welch & Associates
5  2401 Fountainview, Suite 700
   Seventh Floor
6  Houston, TX  77057

7

   ATTORNEYS FOR PETITIONER/COUNTER-RESPONDENT,
8  DISH NETWORK L.L.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 8    PAGE 34

**EXHIBIT "C"**

## AMERICAN ARBITRATION ASSOCIATION

Case No. 77 147 Y 00192 09 NOLG

**DISH NETWORK L.L.C., f/k/a**
**ECHOSTAR SATELLITE L.L.C.,**

     Claimant,

v.

**NEWPORT SATELLITE GROUP,**

     Respondent.

---

## CLAIMANT'S MOTION FOR LEAVE TO FILE AN AMENDED DEMAND FOR ARBITRATION

---

Claimant DISH Network L.L.C., f/k/a EchoStar Satellite L.L.C. ("Claimant" or "DISH Network"), by and through counsel, hereby submits this Motion for Leave to File an Amended Demand for Arbitration in the above-entitled action pursuant to Rule 6 of the Commercial Rules of Arbitration. Specifically, Claimant respectfully seeks leave to: (1) amend the amount of damages incurred by DISH Network to coincide with a recently completed audit of accounts submitted by Respondent Newport Satellite Group ("Respondent" or "Newport") for activation and payment; and (2) add the partners and corporate officers of Newport as individual respondents to the instant arbitration. In support of said Motion, Claimant states the following:

### I. INTRODUCTION

On April 10, 2009, Claimant filed a Demand for Arbitration with the American Arbitration Association ("AAA") asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, and unjust enrichment. The crux of these allegations hinges upon Respondent's submission of: (1) false and misleading information to DISH Network for the purpose

EXHIBIT C PAGE 35

of making current or former DISH Network customers appear as if they were "new" customers so that Newport would qualify for certain incentive payments; and (2) fraudulent social security information to DISH Network for the purpose of qualifying potential customers for promotional programs that required a particular credit score, and thus, allow Newport to receive the associated incentive payments.

Prior to filing suit, DISH Network conducted a preliminary audit of accounts submitted by Newport for activation and payment in 2007. The audit revealed that Newport illegally received at least $1.5 million in incentive payments from DISH Network on accounts that contained either fictitious or duplicate customer information. Because the audit addressed only a fraction of the accounts submitted by Newport, a comprehensive investigation of all accounts was completed in June 2009. As a result, Claimant discovered that the actual damages incurred by DISH Network is approximately $12,854,640. Therefore, Claimant requests leave to amend the amount of damages previously asserted.

In addition, Claimant seeks leave to add Arash "Alex" Dastmalchi, Christopher Hoskins, and Robert Stark (collectively, the "Individual Respondents") as parties to this arbitration. The Individual Respondents are not only the partners and corporate officers of Newport, but subject to the arbitration provisions of the Retailer Agreement. Moreover, upon information and belief, discovery will show that the Individual Respondents created and operated Newport as a corporate fiction to facilitate and profit from a fraudulent scheme against DISH Network.

For these reasons, as described in detail below, Claimant respectfully requests that the Arbitration Panel allow DISH Network to file the Amended Demand for Arbitration, attached hereto as Exhibit 1.

2

EXHIBIT C PAGE 36

## II.  LEGAL STANDARD

The Commercial Rules of Arbitration provide, in pertinent part, that "[a]fter the arbitrator is appointed, . . . no new or different claim may be submitted except with the arbitrators' consent." COMMERCIAL ARBITRATION RULES R-6 (2009), *available at* http://ww.adr.org.   Here, the appointments to the Arbitration Panel were confirmed by the AAA on or about September 1, 2009. Therefore, Claimant respectfully requests leave to amend the Demand for Arbitration.

Pursuant to state and federal law, leave should be freely given when justice so requires. COL. R. CIV. P. 15(a); FED. R. CIV. P. 15(a).  Accordingly, "[i]f the underlying facts and circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *I'Mnaedaft, Ltd. v. Intelligent Office Sys., LLC*, No. 08-cv-01804-LTP-KLM, 2009 WL 77498, at *1 (D. Colo. Jan. 12, 2009) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### III.  ARGUMENT

**A.      The Panel Should Afford Claimant the Opportunity to Amend the Amount of Damages Initially Asserted in the Demand for Arbitration.**

Claimant requests leave to amend the amount of damages previously asserted in the Demand for Arbitration.  Prior to filing suit, DISH Network conducted a preliminary audit of fictitious and fraudulent accounts submitted by Newport for activation and payment.  The audit identified at least $1.5 million of incentives illegally acquired by Respondent.  Recently, however, DISH Network completed a comprehensive review of all accounts submitted by Newport for payment in 2006 and 2007.  Similar to the initial audit, Claimant discovered numerous accounts that contained false and duplicate customer information.  Moreover, DISH Network learned that the harm resulting from Respondent's illegal scheme was far more severe than previously alleged.  Indeed, Claimant incurred

3

EXHIBIT C  PAGE 37

actual damages of approximately $12,854,640. Therefore, Claimant respectfully requests leave to file the Amended Demand for Arbitration—a pleading that avers the actual damages incurred by DISH Network. (Ex. 1 at 4, 7.) *See Hildyard v. W. Fasteners, Inc.*, 522 P.2d 596, 598 (Colo. App. 1974) ("[T]he trial court correctly authorized amendment of the complaint upon a showing that the nature and extent of plaintiff's damages were not entirely known at the time the original complaint was filed."); *Puritan Pie Co. v. Milprint, Inc.*, 494 P.2d 850, 853 (Colo. App. 1971) (finding no error "in allowing plaintiff to amend its complaint so that the amount of damages claimed conformed with the evidence.").

**B.    The Panel Should Afford Claimant the Opportunity to Add the Individual Respondents as Parties to this Arbitration Proceeding.**

Upon information and belief, discovery will show that the Individual Respondents (Arash "Alex" Dastmalchi, Christopher Hoskins, and Robert Stark) created and operated Newport as a corporate fiction to perpetrate a fraudulent scheme against DISH Network. Therefore, Claimant requests leave to add the Individual Respondents as parties to this arbitration because "adherence to the corporate fiction [would] sanction fraud, promote injustice, or lead to an evasion of legal obligations." *Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.*, 176 F. Supp. 2d 1091, 1095 (Colo. 2001).

**C.    The Individual Respondents are Subject to the Arbitration Provision in the Retailer Agreement.**

The Individual Respondents are bound to the arbitration provisions of the Retailer Agreement for several reasons. First, courts have frequently found that partners are bound by an arbitration agreement entered into by the partnership. For example, in *Hartford Financial Systems v. Florida Software Services, Inc.*, a federal court found that the general partners–who were jointly liable for

EXHIBIT C  PAGE 38

all debts and obligations of the partnership—were bound by the arbitration provision entered into by

the partnership. 550 F. Supp. 1079, 1086 (D. Me. 1982). Likewise, in *Keller Construction Co. v.*

*Kashani,* a California court found that "a sole partner of a limited partnership . . . is subject to an

arbitration agreement between the partnership and a third party." 269 Cal. Rptr. 259, 263 (Cal. Ct.

App. 1990).

Second, under traditional agency theory, because a principal is bound to the terms of a valid

arbitration clause, its agents, employees, and representatives are also covered by the terms of such

agreements. *See Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281-82 (6th Cir. 1990); *Letizia v.*

*Prudential Bache Sec.,* 802 F.2d 1185, 1187-88 (9th Cir. 1986). In *Arnold,* for example, a

shareholder filed suit against a corporation and its officers alleging RICO violations and asserting

claims under section 10(b) of the Exchange Act. 920 F.2d at 1272. In holding that the arbitration

clause should be enforced, the court also extended its scope to non-signatory officers who were

deemed agents of the corporation. *Id.* at 1281-82. Similarly, in *Letizia,* the court held that statutory

claims against non-signatory brokers were subject to arbitration agreements. 802 F.2d at 1187-88![1]

Finally, the very language of the Retailer Agreement and governing arbitration clauses

identifies and covers the Individual Respondents. Specifically, section 15.3 provides, in relevant

part, that "any and all disputes, controversies or claims between the Retailer and/or any of its

*Affiliates,* on the one hand, and [DISH Network] and any of its *Affiliates,* on the other hand,

---

[1]     The *Letizia* court noted that brokers and employees were integral to, if not directly
responsible for, the alleged statutory violations of the principal corporation. *Id.* at 1188. Indeed,
"[a]ll of the individual defendants' allegedly wrongful acts related to their handling of Letizia's
securities account . . . . We conclude that the arbitration clause is applicable to [claims against the
broker and his supervisor]." *Id.*; *see also Trott v. Paciolla,* 748 F. Supp. 305, 309 (E.D. Pa. 1990)
(finding "[a]n entity . . . can only act through its employees, and an arbitration agreement would be
of little value if it did not extend to [them].").

5

EXHIBIT C PAGE 39

including without limitation any and all disputes, controversies or claims arising out of or in connection with this Agreement . . . shall be resolved solely and exclusively by binding arbitration . . . ." (emphasis added). The term "Affiliate," as defined by section 1.2 of the Retailer Agreement, means "any person or entity directly or indirectly controlling, controlled by or under common control with another person or entity." As the partners and corporate officers of Newport, the Individual Respondents are ostensibly "Affiliates," and consequently subject to the arbitration provisions of the Retailer Agreement. Therefore, Claimant respectfully requests leave to add the Individual Respondents as parties to the above-entitled arbitration.

## IV. CONCLUSION

For the foregoing reasons, Claimant DISH Network L.L.C. respectfully seeks leave to file the Amended Demand for Arbitration, a pleading that effectively: (1) amends the amount of actual damages incurred by DISH Network as a result of Respondent's misconduct; and (2) adds the partners and corporate officers of Newport as individual respondents to the instant arbitration.

Respectfully submitted this 13th day of November 2009.

T. WADE WELCH & ASSOCIATES

Richard R. Olsen
Ashlee M. Smith
2401 Fountainview, Suite 700
Houston, Texas 77057
Telephone: (713) 952-4334
rolsen@twwlaw.com
asmith@twwlaw.com

**ATTORNEYS FOR CLAIMANT
DISH NETWORK L.L.C.**

6

EXHIBIT C PAGE 40

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of *Claimant's Motion for Leave to File an Amended Demand for Arbitration* was served upon the AAA Case Manager and the *pro se* Respondent, in accordance with the Federal Rules of Civil Procedure and Commercial Arbitration Rules, on this 13th day of November 2009:

Ms. Noreen Garcia
Manager of ADR Services
American Arbitration Association
Western Case Management Center
6795 North Palm Avenue, 2nd Floor
Fresno, California 93704
Telephone: (559) 490-1887

*(via electronic mail at NoreenGarcia@adr.org)*

Newport Satellite Group
3200 Park Center Drive, Suite 1300
Costa Mesa, California 92626

*(via U.S. Priority Mail Tracking No. 9410 8036 9930 0001 3523 53)*

Newport Satellite Group
c/o Alton G. Burkhalter
2020 Main Street, Suite 600
Irvine, California 92614

*(via U.S. Priority Mail Tracking No. 9410 8036 9930 0001 3518 75)*

Ashlee M. Smith

7

EXHIBIT C PAGE 41

# EXHIBIT "D"

1   BURKHALTER KESSLER GOODMAN & GEORGE LLP
    Daniel J. Kessler, Esq., Bar No. 173710
2   Joshua A. Waldman, Esq., Bar No. 222859
    2020 Main Street, Suite 600
3   Irvine, California 92614
    Telephone: (949) 975-7500
4   Facsimile: (949) 975-7501

5   Attorneys Specially Appearing for Alex Dastmalchi, Christopher Hoskins,
    And Robert Stark

6

7                        AMERICAN ARBITRATION ASSOCIATION

8

9

10

11  DISH NETWORK, L.L.C., f/k/a ECHOSTAR        AAA Case No. 77 147 Y 00192 09
12  SATELLITE L.C.C.,

13                                              THIRD-PARTY, NON-SIGNATORIES
                   Claimant,                    ALEX DASTMALCHI'S, ROBERT
14                                              STARK'S, AND CHRISTOPHER
                                                HOSKINS' OPPOSITION VIA SPECIAL
15  vs.                                         APPEARANCE TO CLAIMANT'S
                                                MOTION FOR LEAVE TO FILE AN
16  NEWPORT SATELLITE GROUP,                    AMENDED DEMAND FOR
                                                ARBITRATION
17                 Respondent.

18

19
    NEWPORT SATELLITE GROUP, INC.,
20
                   Counter-Claimant,
21
22  vs.

23  DISH NETWORK, L.L.C., and DOES 1 through
24  10,

25                 Counter-Respondent.

26

27

28

                                        EXHIBIT __D__ PAGE __42__

# I.

## PREAMBLE

First and foremost, Alex Dastmalchi, Christopher Hoskins, and Robert Stark (the "Non-Signatories") never signed the Retailer Agreement, and thus never agreed to arbitrate any dispute with EchoStar, much less participate in arbitration before a three arbitrator panel in Colorado, when each of these individuals reside elsewhere. The Non-Signatories specially appear to strenuously object to Dish Network, LLC's ("Dish") request for leave to amend its Statement of Claim to add the Non-Signatories as individual respondents to this arbitration.

Moreover, the Non-Signatories further specially appear to object to this panel determining the arbitrability of whether the Non-Signatories may be subject to the arbitration provision in the Retailer Agreement. **To be perfectly clear, the Non-Signatories do not agree to submit the question of arbitrability to this panel of arbitrators, and by filing this Opposition, the Non-Signatories do not grant to the arbitration panel the right, authority, or ability to decide this critical preliminary question**. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920 (1995).[1]  Pursuant to well settled law, issues of arbitrability are to be determined by a court of law, and this panel is not authorized to determine whether the Non-Signatories may be compelled to arbitrate in light of the Non-Signatories' refusal to waive their right to a judicial determination of arbitrability.

# II.

## INTRODUCTION OF ARGUMENT

Dish's request for leave to amend its Statement of Claim to add three individual non-signatories to the Retailer Agreement as respondents to the arbitration (the "Request") is far more

---

[1] The *First Options* case provides that a party may object, as the Non-Signatories are objecting herein, without that objection constituting a waiver of that party's right to have the question of arbitrability determined by a court of law, and not by a panel of arbitrators.

1

EXHIBIT ⅁  PAGE 43

1   notable for what it omits than what it states.  First and foremost, Dish's Request conspicuously failed

2   to reference the directly on-point controlling law from the highest court in the land, which

3   unequivocally provides that "the question of whether parties agreed to arbitrate is to be decided by the

4   court, not the arbitrator." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct.

5   1347 (1960).  "[A] gateway dispute about whether the parties are bound by a given arbitration clause

6   [is] for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588,

7   (2002) (*emphasis added*).

8           Not only does Dish's Request fail to recognize the controlling law from the United

9   States Supreme Court, but it also failed to cite to a single authority from any jurisdiction, anywhere,

10   supporting Dish's novel assertion that arbitrators are empowered to determine the rights and

11   obligations of parties who are non-signatories to the arbitration agreement.   Rather, Dish

12   disingenuously cites to wholly distinguishable cases in which the non-signatories to the arbitration

13   agreement desired arbitration (rather than opposed it), which of course is directly opposite to the facts

14   present in the instant case.

15           Dish also cites to cases in which courts, not arbitrators, compelled non-signatory

16   partners to participate in arbitration that the partnership contractually consented to on the grounds that

17   the individual partners were personally liable for the partnership's debts through operation of law.  In

18   the present case, however, the Non-Signatories are not partners, but rather they are shareholders of

19   Newport Satellite Group, Inc.  Unlike partners, shareholders generally do not bear any liability for the

20   corporation's debt.  Even more to the point, in the few partnership cases Dish cites in which non-

21   signatories were compelled to arbitrate against their will, courts determined the questions of

22   arbitrability, *never* arbitrators.

23           Lastly, Dish filed its Request more than 6 months after it filed its initial Statement of

24   Claim.  Despite a more than 6 month delay, Dish's Request is conspicuously silent as to why it delayed

25   for so long before attempting to add the Non-Signatories as individual respondents.  Based on Dish's

26   undue and unexplained delay alone, the panel should deny Dish's request to file an amended Statement

27   of Claim.

28

EXHIBIT ___D___ PAGE 44

THIRD PARTY, NON-SIGNATORIES' OPPOSITION VIA SPECIAL APPEARANCE TO CLAIMANT'S
MOTION FOR LEAVE TO FILE AN AMENDED DEMAND FOR ARBITRATION

III.

ARGUMENT

**A.      The Non-Signatories Do Not Consent to This Panel's Jurisdiction Over Them Or Even To This Panel's Determination of Whether The Panel May Impose Jurisdiction Over Them, And Appear Specially As Non-Parties To Oppose Dish's Request for Leave – Not to Confer Jurisdiction to the Panel.**

The Non-Signatories never executed the Retailer Agreement, or any other contract, in which they agreed to arbitrate any dispute with Dish. The Non-Signatories thus strenuously object to Dish's request to add the Non-Signatories as individual respondents to this arbitration on the grounds that this panel is not empowered to determine whether the Non-Signatories may be named as Respondents; only a court of law can make that decision. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920 (1995)

Thus, the Non-Signatories' objection to Dish's Request constitutes only a special appearance to challenge the panel's imposition of jurisdiction over them based on the panel's lack of authority to decide the issue of arbitrability and **to express the Non-Signatories' intent that they do not agree to submit to this panel issues of arbitrability**. The Non-Signatories do not waive their objection to this panel's jurisdiction over them through filing the instant objection.

**B.      This Panel Has No Authority To Determine Whether Non-Signatories To the Arbitration Provision May Be Bound Thereby.**

According to the United States Supreme Court, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.... Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347 (1960) *(emphasis added)*. "[A] gateway dispute about whether the parties are bound by a given arbitration clause [is] for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, (2002) *(emphasis added)*.

EXHIBIT __1__  PAGE __4__

Indeed, "[a]n arbitrator has no power to determine rights and obligations of one who is not a party to the arbitration agreement.  Therefore <u>a trial court</u> must <u>first</u> determine the status of a person who demands arbitration under a contract that he or she did not sign (or against whom arbitration is sought to be enforced)."   Knight, Chernick, Haldeman, and Bettinelli, Cal. Prac. Guide Alt. Disp. Res. § 5:287 (Rutter Group 2009) citing *American Builder's Ass'n v. Au-Yang* (1990) 226 Cal. App. 3d 170, 179 (*emphasis added*).[2]

### 1.     Newport Satellite Group Was Not Authorized To Bind the Non-Signatories and Even If It Were, This Panel Is Not Empowered to Make That Determination.

Dish asserts, with no legal support whatsoever, that the Non-Signatories are bound by the arbitration agreement because the contract <u>Newport Satellite Group</u> executed purportedly binds Newport Satellite Group's "affiliates," which Dish contends includes the Non-Signatories. Dish's unsupported argument misses the point, and is meritless.

First and foremost, this panel is not empowered to determine whether Newport Satellite Group was authorized to bind the Non-Signatories to the Retailer Agreement or whether the Non-Signatories are Newport Satellite Group's "affiliates" since the question of whether a particular dispute is arbitrable is one for the court, not the arbitrators. *McCauley v. Halliburton Energy Services, Inc.,* 161 Fed. Appx. 760 (10th Cir. 2005); *See also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84, 123 S.Ct. 588, (2002) (*emphasis added*) ("[A] gateway dispute about whether the parties are bound by a given arbitration clause [is] for a court to decide.")

Moreover, even assuming the panel was authorized to determine whether Newport Satellite Group was empowered to bind the Non-Signatories to the arbitration agreement (it is not), Dish failed to provide any authority for its novel legal theory that Newport Satellite Group could bind the Non-Signatories to the Retailer Agreement without their consent.  Of course, Dish failed to provide any such authority because it is axiomatic that a person cannot be bound to a contract without his own

---

[2] *See also Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54-55 (3d Cir. 1980); *Carpenters 46 No. Calif. Counties Conference Bd. v. Zcon Builders,* 96 F.3d 410, 414, (9th Cir. 1996); *Microchip Technology Inc. v. U.S. Phillips Corp.,* 367 F.3d 1350, 1356-1358 (Fed. Cir. 2004) (all holding that the trial court must first determine whether a non-signatory may be compelled to arbitrate, not an arbitrator).

EXHIBIT D PAGE 46

1  consent. *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279, 294, 122 S.Ct. 754 ("It goes without

2  saying that a contract cannot bind a nonparty.")

3

4         **C.**    **This Panel Has No Authority To Determine the Non-Signatories Are Alter**

5  **Egos of Newport Satellite Group**.

6            Dish's Request alleges, with no evidentiary support or specific facts whatsoever, that

7  "upon information and belief, discovery will show that the Individual Respondents....created and

8  operated Newport as a corporate fiction to perpetrate a fraudulent scheme against DISH Network."

9  However, the panel lacks authority to impose jurisdiction over non-signatories based on an alter ego

10  theory prior to a judicial determination that the individuals are, in fact, the corporation's alter egos.

11            A non-signatory to an arbitration agreement is not required to arbitrate a dispute

12  involving its affiliate absent a court determination of an alter ego relationship. *Retail Clerks Union*

13  *Local 428, AFL-CIO v. L. Bloom Sons Co., Inc.* (1959) 173 Cal. App. 2d 701, 703. "A corporation's

14  separate identity will be disregarded only when, and to the extent that it is necessary when, and in

15  order to prevent fraud or injustice. [*citations omitted*]. The proper forum for that determination is, of

16  course, a court of law." *Id.* See also *Carpenters 46 No. Calif. Counties Conference Bd. v. Zcon*

17  *Builders*, 96 F.3d 410, 414-416 (9th Cir. 1996) (the Ninth Circuit reversed the district court's

18  erroneous decision to allow an arbitrator to bind a non-signatory to arbitration based on an alter ego

19  theory prior to a judicial determination that the non-signatory was the alter ego of the signatory

20  defendant.)

21

22         **D.**    **Dish's Purported "Legal Authority" Does Not Support This Panel's**

23  **Imposition of Jurisdiction Over the Non-Signatories**.

24            In an effort to pull the wool over this panel's eyes, Claimant refers the panel to various

25  non-controlling cases that bear absolutely no resemblance to the present case and simply do not govern

26  Dish's Request. For example, Dish relies upon *Arnold v. Arnold Corp.*, 920 F.2d 1185 (6th Cir. 1990)

27  and *Letizia v. Prudential Bache Sec.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986), two cases in which non-

28  signatories to the arbitration agreement wanted to participate in the arbitration and the court compelled

EXHIBIT ___D___ PAGE ___47___

1   the signatories to proceed against them in arbitration, which of course is directly opposite to this case

2   in which the non-signatories oppose arbitration.

3          Specifically, in *Arnold*, the issue to be decided was not whether the court could bind

4   non-signatories to arbitration despite their will as Dish disingenuously claims, but "whether the

5   nonsignatory defendants are entitled to arbitration as agents of the signatory defendant...." *Arnold v.*

6   *Arnold Corp.,* 920 F.2d at 1281.  The court ultimately ruled the non-signatory defendants were so

7   entitled.  Similarly, in *Letizia v. Prudential Bach Securities*, the court addressed whether a broker's

8   employees, who were non-signatories to the brokerage agreement, were entitled to the arbitration

9   provision in the plaintiff's action against the broker, not whether the plaintiff could compel the

10   employees to arbitrate against their will.  *Letizia v. Prudential Bache Sec.*, 802 F.2d 1185.

11          Unlike the non-signatories in *Arnold* and *Letizia* who desired arbitration, here the Non-

12   Signatories actively oppose arbitration on the grounds that this panel is not authorized to adjudicate

13   issues of arbitrability.  Thus, *Arnold* and *Letizia* have absolutely no bearing on the facts of this case, or

14   as articulated by one court faced with the similar inapposite authority, Dish's authorities have "nothing

15   to do with the price of tomatoes."  *See Bensara v. Marciano* (2001) 92 Cal.App.4th 987 (in response to

16   a party's attempt to compel non-signatories to arbitrate by citing cases in which non-signatories sought

17   arbitration against signatories, the court appropriately stated "[s]ince [the non-signatory defendant] has

18   not asked for the benefit … [of the] arbitration provision but has, to the contrary, actively opposed

19   arbitration, [cases like *Arnold* and *Letizia* upon which Dish rely] has nothing to do with the price of

20   tomatoes.")

21          In addition to relying upon distinguishable cases in which non-signatories sought

22   arbitration, rather than opposed it as they do here, Dish also relies upon two equally inapposite

23   partnership cases.  In *Hartford Financial Systems v. Florida Services, Inc.,* and *Keller Construction*

24   *Co. v. Kashani*, the courts bound non-signatory general partners, who were liable for all debts of the

25   partnership pursuant to principle of partnership law, to arbitration provisions entered into by the

26   partnerships.  *Hartford Financial Systems v. Florida Services, Inc.*, 550 F. Supp. 1079, 1086 (D. Me.

27   1982); *Keller Construction Co. v. Kashani*, 269 Cal. Rptr. 259, 263 (1990).  In these cases, the courts

28   elected to bind non-signatory partners to an arbitration provision executed by the partnership because

EXHIBIT **5** PAGE **48**

THIRD PARTY, NON-SIGNATORIES' OPPOSITION VIA SPECIAL APPEARANCE TO CLAIMANT'S
MOTION FOR LEAVE TO FILE AN AMENDED DEMAND FOR ARBITRATION

1   partners are jointly and severally liable for the partnership's debts as a matter of law. *See Section 17 of*

2   *the Uniform Partnership Act.*

3   However, in the present case, the Non-Signatories are not partners who are jointly and

4   severally liable for Newport Satellite Group's debts. To the contrary, they are shareholders in the

5   corporation, Newport Satellite Group, Inc. Unlike partnership law which holds partners jointly and

6   severally liable for the partnerships' debts, corporate law generally shields the shareholders of a

7   corporation from liability for the corporation's debts. *McCallum Family L.L.C. v. Winger* (2009) 2009

8   WL 3465332 (Colo.App.) ("In general, a corporation is treated as a legal entity separate from its

9   shareholders, officers, and directors; this permits shareholders to invest with the assurance that they

10   will not be held personally liable for the corporation's debts.") Therefore, *Hartford* and *Keller* also

11   have "nothing to do with the price of tomatoes" and do not govern this case in which the entity

12   signatory is a corporation, not a partnership.

13   More to the point, even assuming the liability of a partner to a partnership was similar

14   to the liability of a shareholder to a corporation (it is not), *Hartford* and *Keller* still do not support

15   Dish's contention that arbitrators are empowered to determine the rights and obligations of non-

16   signatories as this issue was not even addressed in those cases. Ultimately, Dish did not cite to a single

17   authority that supports this panel's authority to determine whether it may impose jurisdiction over non-

18   signatories who never agreed to resolve their disputes through arbitration, despite the Non-Signatories'

19   objection.

20

21   **E.    Dish's Request Should Be Denied Because It Is Untimely.**

22   Under Colorado law, undue delay constitutes grounds for denying a request for leave to

23   amend. *Espinoza v. Perez* (2006) 165 P.3d 770, 774. Here, Dish delayed for more than six months

24   from the date it filed its initial Statement of Claim until it sought to amend in order to add the Non-

25   Signatories. Notably, Dish's Request failed to explain this excessive, undue delay, or even address it

26   at all. Thus, even if this panel did address the Request on its merits (which it should not), based on

27   Dish's unexcused and unexplained delay alone, Dish's request for leave to amend must be denied.

28

EXHIBIT ___ PAGE 49

# IV.

## CONCLUSION

Dish's Request is replete with authorities supposedly supporting the proposition that individual non-signatories may be compelled to arbitrate. Dish's Request simply misses the mark.

The real question is not whether Alex Dastmalchi, Christopher Hoskins and Robert Stark may ultimately be compelled to arbitrate despite their failure to execute an arbitration agreement. Rather, the real question is whether this panel of arbitrators is empowered to decide the rights and obligations of Alex Dastmalchi, Christopher Hoskins, and Robert Stark, as non-signatories to the arbitration agreement in spite of their insistence that only a court may decide these issues of arbitrability. According the United States Supreme Court, the answer to that question is undoubtedly and emphatically **no**. *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347 (1960) ("[T]he question of whether parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347 (1960).

The Non-Signatories demand that a court of law, not this panel, determine whether they may be bound by the arbitration agreement.

DATED: November 30, 2009     BURKHALTER KESSLER GOODMAN & GEORGE LLP

By: _____
    Daniel J. Kessler, Esq.
    Attorneys for Third Parties,
    Alex Dastmalchi, Robert Stark, and Christopher Hoskins

EXHIBIT __D__  PAGE __59__

8

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF ORANGE

3

4          I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to the within action; my business address is 2020 Main Street, Suite 600, Irvine, California 92614.

5

6          On **November 30, 2009**, I caused the foregoing document described as **THIRD-PARTY, NON-SIGNATORIES ALEX DASTMALCHI'S, ROBERT STARK'S, AND CHRISTOPHER HOSKINS' OPPOSITION VIA SPECIAL APPEARANCE TO CLAIMANT'S MOTION FOR LEAVE TO FILE AN AMENDED DEMAND FOR ARBITRATION** to be served on the interested parties in this action [X] by placing [ ] the original [X] a true copy thereof enclosed in sealed envelopes addressed as stated on the attached Service List:

7

8

9

10

11     **[X]     BY ELECTRONIC TRANSMISSION**

12          **[X]** I sent via electronic transmission on this date a copy of the above-referenced document to the addressee stated on the attached Service List.

13

14          **[X] (State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

15

16          Executed on **November 30, 2009**, at **Irvine, California**.

17

18

19                                        JOSHUA A. WALDMAN

20

21

22

23

24

25

26

27

28

EXHIBIT D PAGE 51

1

## SERVICE LIST

2

3  Ms. Noreen Garcia
   Manager of ADR Services
4  American Arbitration Association
   Western Case Management Center
5  6795 North Palm Avenue, 2nd Floor
   Fresno, CA  93704
6  noreengarcia@adr.org

7  Richard R. Olsen, Esq.
   Ashlee M. Smith, Esq.
8  T. Wade Welch & Associates
9  2401 Fountainview, Suite 700
   Houston, TX  77057
10  rolsen@twwlaw.com
   asmith@twwlaw.com
11

12  ATTORNEYS FOR CLAIMANT,
   DISH NETWORK L.L.C.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___D___ PAGE __52__

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV09- 1404 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[ ]** **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[X]** **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ]** **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ALEX DASTMALCHI, an individual;
CHRISTOPHER HOSKINS, an individual; and
ROBERT STARK, an individual,

PLAINTIFF(S)

v.

DISH NETWORK, L.L.C., a Colorado
limited liability company

DEFENDANT(S).

CASE NUMBER

**SACV09-1404 CJC(RNBX)**

**SUMMONS**

TO:   DEFENDANT(S): <u>DISH NETWORK, L.L.C., a Colorado</u>
<u>limited liability company</u>
A lawsuit has been filed against you.

Within ⟪20⟫ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>Daniel J. Kessler, Esq.</u> , whose address is <u>BURKHALTER KESSLER GOODMAN & GEORGE LLP, 2020 Main Street, Ste. 600, Irvine, CA 92614</u> . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: DEC - 2 2009

By: *Nancy Castro*

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                SUMMONS                                CCD-1A

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| ALEX DASTMALCHI, an individual; CHRISTOPHER HOSKINS, an individual; and ROBERT STARK, an individual | DISH NETWORK, L.L.C., a Colorado limited liability company |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| BURKHALTER KESSLER GOODMAN & GEORGE LLP<br>Daniel J. Kessler, Esq., SBN 173710<br>Joshua A. Waldman, Esq., SBN 222859<br>2020 Main Street, Suite 600<br>Irvine, CA  92614<br>(949) 975-7500; (949) 975-7501 | |

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:**   ☐ Yes   ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:**   ☐ Yes   ☒ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

28 USC section 1332 (Diversity Jurisdiction) Declaratory Relief

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☒ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | | | | ☐ 871 IRS - Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number: **SACV09-1404 CJC(RNBX)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CCD-JS44

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No   [ ] Yes
If yes, list case number(s):

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No   [ ] Yes
If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)        [ ] A. Arise from the same or closely related transactions, happenings, or events; or
                                    [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
                                    [ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                                    [ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
        [ ]   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
        [ ]   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Colorado |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
        **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| ORANGE | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____        Date  December 2, 2009
                                        DANIEL J. KESSLER, ESQ.

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |